## FULTON INSURANCE CO. *vs.* GOODMAN;

### MOBILE MARINE DOCK & MUTUAL INSURANCE CO. *vs.* SAME.

[ACTIONS ON POLICIES OF INSURANCE ON STEAMBOAT.]

1. *Construction of charges to jury.*—The instructions of the court to the jury are to be construed in connection with the evidence, and as explanatory of each other; and if they are correct when thus construed and applied, though erroneous as universal propositions, they do not warrant a reversal of the judgment.

2. *When abandonment may be made for constructive total loss.*—When the condition of an insured vessel, which has been sunk from striking a snag, is such as to produce, in the minds of practical and reasonable men generally, the opinion that she probably cannot be raised and repaired at a cost of less than half her value at the port of repairs, the assured may abandon as for a constructive total loss; and the fact that the vessel is afterwards raised and repaired, at a cost of less than half her value, does not prove that he had no right to abandon.

3. *Construction of policy as to value of interest owned by assured in determining right of abandonment.*—Under a policy providing that the assured shall not have the right to abandon, as for a total loss, "unless the injury sustained be equivalent to fifty per cent. on the *value of the interest owned by the assured*," the actual value of the vessel when repaired, at the port of repairs, and not the agreed value named in the policy, is the standard with which the cost of repairs is to be estimated in determining the right of abandonment.

4. *Validity of offer of abandonment.*—Where the mortgagor of an insured vessel, which has been sunk, makes an offer to abandon, under circumstances which authorize an abandonment; and the underwriters, knowing of the existence of the mortgages, do not reject the abandonment on account of the mortgagor's want of authority to make it; and the mortgagee soon afterwards assents to the abandonment, while the vessel is still at the disposal of the underwriters, and informs them of his assent and approval,—the underwriters are precluded from objecting to the validity of the offer of abandonment on account of the mortgagor's want of authority to make it.

5. *Same.*—A parol abandonment is sufficient, and, if rightfully made, cannot be forfeited by any subsequent event without the assent of the assured.

6. *Implied revocation of abandonment.*—After the mortgagor of an insured boat has made a valid offer of abandonment, on account of a constructive total loss, and the mortgagee has ratified and assented to it. the mere fact that the latter subsequently sells the boat under his mortgage, after she has been raised and repaired by the underwriters, who have given notice to the assured that they will no longer be responsible for her, does not operate as a waiver or revocation of the abandonment so far as the mortgagor is concerned.

7. *Election of underwriters to interpose for recovery and repair of vessel.*—Where several policies on a vessel have been effected with different insurance companies, one of which secures to the underwriters the election, in the event the assured fails or neglects to adopt prompt and efficient measures for the recovery of the vessel, "to interpose and recover said boat, and cause the same to be repaired," &c., this provision cannot enure to the benefit of the other underwriters, when sued for a technical total loss, especially when the election has not been exercised by the insurers to whom it was reserved.

8. *Specific objection to competency of witness waives other objections.*—An objection to the competency of a witness, "on the ground of interest," does not raise the question of his competency on grounds of public policy, or on account of his being the transferror of the cause of action.

9. *Competency of mortgagee as witness for mortgagor.*—Under section 2302 of the Code, the mortgagee of an insured boat, whose debt has been paid by a sale of the boat, after she had been abandoned for a constructive total loss, and subsequently raised and repaired by the underwriters, is a competent witness for his mortgagor, in an action brought by the latter against the underwriters to recover for the loss.

APPEAL from the Circuit Court of Mobile.

Tried before the Hon. C. W. RAPIER.

THESE two actions were brought by John H. Goodman, against the appellants ; were founded on policies of insurance on the steamboat *Jenny Bealle*, and were tried together by consent. The policy of the Fulton Insurance Company was effected by said John H. Goodman, "for account of himself; " was for $5,000, and was dated the 4th July, 1853. The policy of the Marine Dock and

Mutual Insurance Company was also taken by John H. Goodman, but "for account of whom it may concern, loss (if any) payable to Duke W. Goodman;" was also for $5,000, and was dated the 20th June, 1853. Each policy was for the term of one year; in each the boat was valued at $22,500, and it was agreed that she should not be insured beyond $15,000; and each contained the following (with other) clauses: "It is agreed, that the assured shall not have the right to abandon, as for a total loss, unless the injury sustained be equivalent to fifty per centum on the value of the interest owned by the assured; * * * and in case of any loss or misfortune, it shall be lawful, and it shall be the duty of the insured, his factors, servants, and assigns, to sue, labor and travel, for, in, and about the defense, safeguard and recovery of the said steamboat, or any part thereof, without prejudice to this insurance, to the charges whereof the insurers will contribute, in proportion as the sum insured is to the whole sum at risk; * * * and in case of injury or accident, the officers and crew shall not leave the boat, until the decision of the assurers, in case of abandonment, shall be known."

Another policy on said boat, for $5,000, was also effected by said Goodman, with the Franklin Insurance Company of Kentucky, on the 21st June, 1853, which contained the following clauses: "It is agreed, that in case of any loss or misfortune, as aforesaid, it shall be the duty of the assured to use every reasonable effort for the safeguard and recovery of the said steamboat, and every part thereof, and, if recovered, to cause the same to be forthwith repaired, if practicable, to the charges whereof the said insurance company will contribute, in proportion as the sum herein insured bears to the agreed value herein; and in case of the neglect or refusal of the assured, their agents or assigns, to adopt prompt and efficient measures for the safeguard and recovery thereof, then the said company shall have the election to interpose and recover said steamboat, or any part thereof, and cause the same to be repaired for the account of the said company, and to consider such neglect or refusal as an abandonment and sur-

render of all interest by the assured in the said steamboat, &c. ; and in no case whatever shall the assured have the right to abandon, until it is ascertained that the recovery and the repairs of said steamboat are impracticable, or that the damage exceeds fifty per cent. on the value agreed herein."

On the 19th May, 1853, before these policies of insurance were effected, John H. Goodman had mortgaged his entire interest (three-fourths) in said boat to Duke W. Goodman, to secure the payment of three promissory notes, each for $3,500, due and payable on the 10th January, 10th February, and 10th April, 1854 ; the mortgage stipulating, that the mortgagor should keep the boat insured, and hold the proceeds of the insurance for the benefit of the mortgagee ; and containing a power of sale on default.   On the 14th May, 1853, James A. Mooring, the owner of the other fourth part of the boat, had mortgaged his interest therein to said Duke W. Goodman, to secure the payment of a debt of over $1,000, due at ninety days from that time, with power of sale on default.   On the 24th June, 1854, after the sinking of said boat as hereinafter stated, Duke W. assigned to John H. Goodman the policy of the Marine Dock and Mutual Insurance Company.

In April, 1854, before the expiration of the policies, the boat struck a snag, while descending the Tombeckbe river, and sunk.   The nature and extent of the injury were variously stated by the witnesses, and on many points their testimony was conflicting.   A summary of the evidence on these points is not necessary to a correct understanding of the legal principles decided by the court; while the annexed arguments of counsel contain statements of such portions thereof as are sufficient to show the points presented by them respectively.   John H. Goodman was master of the boat at the time of the accident, which occurred on Thursday, the 13th April. On examining the injury which the boat had received, it was deemed unnecessary to attempt to raise her.   The master and crew therefore obtained a flat-boat in the neighborhood, stripped the steamboat of her furniture and all movable

articles, and proceeded to Mobile. On the 21st April, John H. Goodman, the master, made an offer of abandonment to the insurance companies, which they declined to accept. Duke W. Goodman, whose mortgages on the boat were then past due, was not present when this offer of abandonment was made ; but the plaintiff proved that, " before making said offer, he consulted with said Duke W. Goodman, who advised and assented to the abandonment, though the defendants were not informed of this fact until afterwards ; and that said Duke, a short time after said offer was made, informed said companies of his assent to said abandonment, and urged upon them the acceptance of the same, stating that his mortgages should not be in the way if they would settle the policies."

After hearing the representations of the master and some of the crew, as to the condition of the boat, the insurance companies proposed to John H. Goodman, that they should make an attempt to raise and repair her for their common benefit; but Goodman declined to join in the undertaking, and insisted on his right to abandon as for a total loss. The insurance companies afterwards made a contract for the raising of the boat on their own account; agreeing to pay $5,000 if she was raised and brought down to Mobile, and nothing if the attempt failed. Under this contract the boat was raised, at an outlay of about $500, and brought down to Mobile, where she was repaired by the insurance companies, after John H. Goodman had declined to do so, at an expense of about $1,700. After the boat had been repaired, she was tendered by the underwriters to said Goodman ; but he refused to receive her, and still insisted on his right of abandonment as for a total loss. Duke W. Goodman, with the consent of the insurance companies, then took possession of her, and sold her under his mortgages, in July, 1854, for $8,600. She was purchased at the sale on account of the insurance companies, who, after expending some $2,700 in painting and refitting her, sold her to Cox, Brainard & Co. for $15,000.

The plaintiff introduced Duke W. Goodman as a wit-

ness, who testified to the facts above stated in reference to his mortgages, the sale under them, and his assent to the offer of abandonment; also, "that he never would have taken possession of the boat, if the insurance companies would have retained the possession, or if both plaintiff and defendants had not abandoned her; and that his mortgage debt was not paid in any other manner than by the sale of the boat, and neither the mortgage nor the notes had been given up." The defendants objected to the competency of this witness, "on the ground of interest," both when he was offered, and after his testimony had been given; but the court overruled their objection, and they excepted.

"The court charged the jury, among other things,—

"1. That if the condition of the boat was such that, in the opinion of practical men, the great probability appeared to be that she could not be raised and repaired, it was sufficient to justify an abandonment as for a total loss, though she was afterwards raised and repaired at a cost of less than half her value.

"2. That if the injury to the boat was such, that her repairs would cost more than half her value when repaired at the port of repair, then the assured had the right to abandon; and in estimating the expense of repairs, the jury should take into consideration the amount paid by the insurance companies for raising the boat and bringing her to Mobile, if fairly expended; that it was not necessary that the expense of repairs should amount to half the sum named in the policy as the agreed value of the boat, but it was sufficient if equal to half her value in fact when repaired.

"3. That, although it was the duty of the master and crew to labor for the recovery of the vessel, they were not bound to do impossibilities; and that, if it appeared to practical men that the vessel could not be saved, they were justified in abandoning her, and were not bound to wait for the decision of the underwriter on the offer to abandon.

"4. That if the mortgagor was in possession and command of the boat as captain, and the mortgages were for-

feited, perhaps neither he nor the mortgagee alone could make an abandonment; but, if there was a right to abandon, and the mortgagor. having the command and control of the boat as master, did abandon, or offer to abandon her to the defendants; and they knew of the existence of the mortgages, and did not reject the abandonment on account of the mortgages; and if the mortgagee, shortly afterwards, when the offer of abandonment by the mortgagor was still unrevoked, and the boat was still at the disposal of the defendants so far as the mortgagor was concerned, assented to and approved of the abandonment by the mortgagor, and made known to the defendants his assent and approval,—an abandonment so made, if.in other respects good, would be valid.

"5. That a parol abandonment was sufficient, and, when once rightfully made, it fixed the rights of the assured, and could not be forfeited by any subsequent event without the·assent of the assured.

"6. That an abandonment, not accepted, might be waived by the party making it; that the fact that Duke W. Goodman had taken possession of the boat, and sold her, because of his interest, would not have the effect of waiving the abandonment, if he took possession after notice by the insurers that they would no longer be responsible for her, and after her abandonment by John H. Goodman, and did so to protect the interests of all concerned; and that this was a question of intention, to be judged by the acts and declarations of said D. W. Goodman done and made at the time."

The defendants excepted to each of these charges, and then requested the following charges :

"1. That it was the duty of the master and crew of the boat to labor and travel to relieve her from her peril; and if they failed in this duty, the plaintiff could not recover. (This charge the court gave, in connection with the explanations contained in the fourth charge already given.)

"2. That if Duke W. Goodman, the mortgagee, took possession of the boat after she had been repaired by the defendants, by virtue of his powers under the mortgage

deeds, and sold her, and applied the proceeds to the payment of his mortgage debt, this amounted to a revocation of the abandonment. (The court refused this charge.)

" 3. That the jury may infer a revocation of the abandonment from the acts of D. W. Goodman, if they believe that he acted under the terms of his mortgage, and intended thereby to obtain payment of his debt. (This charge was [*not ?*] given by the court as asked, but given as qualified by the fourth general charge.)

" 4. That if D. W. Goodman took possession of the boat, and sold her under his mortgage title, and applied the proceeds of the sale to the payment of his mortgage debt, and made a title to the purchaser under the title and authority of his mortgage,—this is inconsistent with a still subsisting abandonment, and cannot stand with it, and such act amounts to a waiver of the abandonment, and is to be considered the legal intent. (This charge the court refused to give.)

" 5. That to recover for a constructive total loss, the injury must amount to half the value of the thing insured. (This charge was given.)

" 6. That in estimating the amount of the loss, the value named in the policy as the value of the boat must govern, and no other estimate of value can be resorted to. (This charge was refused.)"

The 7th charge was struck out of the bill of exceptions.

" 8. That the true condition of a vessel at the time of abandonment may be arrived at, by evidence of the state of things derived from a subsequent attempt to raise and repair her; and that if the vessel has since been raised and repaired, at an expense of less than half her value named in the policy, it is evidence that the assured had no right to abandon her. (This charge was given, but with this explanation : that the right to abandon depended on the state of the boat at the time of the abandonment, and the probability, in the judgment of reasonable men, of the practicability of raising and repairing her at an expense of half her value in the market.)

" 9. That if the boat was wrecked, or stranded, without such injury to her as to prevent her being got afloat and repaired, within a reasonable time, at a reasonable expense, the assured had no right to abandon. (This charge the court refused to give, but charged the jury, that if the boat, at the time of the abandonment, could not have been raised; or, if the situation of the boat was such as to render it exceedingly improbable that she could be raised, then the right to abandon was good, and the plaintiff might recover for a constructive total loss, although the boat was subsequently raised and repaired at a cost of less than half her value.)

" 10. That if the evidence shows that five or six men raised the boat, and that the only means used by them, not found on the boat after she had been left by the master and crew, were one thousand feet of inch boards, the jury will be authorized to determine upon the evidence whether or not, at the time of the offer to abandon, it was in the power of the master, with all his officers and crew, to have raised the boat, and brought her down to Mobile, and had her repaired, at a cost not exceeding half her market value after she was repaired; and if the jury believe that she could have been so raised and repaired, then the plaintiff cannot recover for a total loss. (This charge the court refused.)

" 11. That even if the injury was equal to half the value of the boat, the effect of the mortgages to D. W. Goodman, if forfeited and unpaid, would be to give him, so far as his debt extended, the right to abandon or not as he thought proper, whether J. H. Goodman consented or not; and that if he thought proper to receive the vessel when repaired, and to sell her for the purpose of paying his mortgage debt, he had the right to do so; and that if he did, it extinguished so much of the interest of J. H. Goodman as was covered by the previous policies. (This charge the court refused; but, after this and the other charges were asked, and before the jury retired, it was agreed between the counsel of the respective parties, and the same expressed to the court, that the jury need not be troubled with the matter, as this would be arranged

between the parties by consent in the event of a verdict for the plaintiff.)

"12. That under the circumstances last above detailed, if such existed, the claim of J. H. Goodman for a total loss of the whole amount insured by him cannot be sustained. (This charge the court refused.)

"13. That the effect of the policy of the Franklin Insurance Company, it being prior in date to that of the Fulton Insurance Company, is such that, on a question of abandonment by John H. Goodman to the three companies jointly, for the purpose of converting a partial into a total loss, he is precluded from denying the right to save and repair the vessel, if the reasonable value of the saving and repairing would not amount to half the value named in the policy; and that the clause in the previous policy to do so, against the will of John H. Goodman, enures as well to the Fulton Insurance Company as to the Franklin Insurance Company, under these circumstances. (This charge was refused by the court.)

"14. That under the terms of the policy of the Fulton Insurance Company, there being two previous insurances, said company could be liable, in case of a partial loss, only in the event the two previous insurances are not sufficient to cover the loss sustained and insured against in this policy; and that the loss, in such case, is not to be divided equally among the companies, but the Fulton company is only liable last, if at all. (This charge was refused by the court.)"

The jury were requested by both parties "to say in their verdict whether they found the loss total or not," and found that the loss was total.

The charges given, the refusal of the several charges asked, and the overruling of the defendant's objection to the competency of Duke W. Goodman as a witness, are the matters now assigned as error.

P. HAMILTON, and GEO. N. STEWART, for the appellants, made these points:

1. The doctrine of abandonment, on which these cases turn, is itself an exception to the general character of an

insurance contract, which is a contract of indemnity. Its operation is to depart from the principle of indemnity, and, in place of the actual loss, recover an increased amount by converting a partial into a total loss.—2 Arnould on Insurance, 996. On account of this departure from the real nature of the contract, the disposition of the courts has been, while upholding the right of abandonment, to restrain and confine it within the limits already established.—2 Burr. 683; 1 Term Rep. 616; 10 East, 341; 16 Pick, 303, 313; 11 Pick. 95; 21 Pick. 456, 470; 5 Serg. & R. 501, 509. The American rule, allowing the right to abandon where the injury exceeds half the value of the thing insured, is a greater departure from the principle of indemnity than the English rule. 2 Arnould, 1086, § 386.

2. The court below erred, in taking the value of the vessel when repaired at the port of repairs, instead of the value named in the policy, as the measure of value with which the extent of the injury was to be compared. The policies sued on are valued policies.—1 Arnould, 303; 2 Phillips, §§ 1176–78. The value in the policy is, or ought to be, the real value of the ship: "it means the amount of the insurable interest; and if the assured has some interest at stake, and there is no fraud, the valuation in the policy is conclusive between the parties, for they have by agreement settled the value."—3 Kent's Com. 272; 3 Taunton, 506; 10 Johns. 79, 84; 2 Phillips, § 1183; 1 Arnould, 308. The language of the policy is, "fifty per cent. on the value of the interest owned by the assured;" which, when the assured are the entire owners, is equivalent to the value of the thing insured. Since the controversy in the case of the Argonaut, a similar clause has been inserted in the Boston policies: "that the assured shall not have the right to abandon for the amount of damages merely, unless the amount which the insurers would be liable to pay, under the adjustment of a partial loss, shall exceed half the amount insured." 2 Arnould, 1111. This clause was construed, in 21 Pick. 467, as meaning one half the value in the policy; though the "amount insured" and the "value in the policy"

may, evidently, be entirely different; as was the case in 1 Curtis, 148, where the amount insured was only $2,000, while the value was $3,000.

3. But, if there were no such clause in the policy, the same rule should govern.—16 Pick. 303; 21 Pick. 467, 482; 7 Metcalf, 453; 1 Gray, 154; 20 Wendell, 287, 300; Parsons on Mercantile Law, 466; 3 Kent, 273; 7 Ham. 284; 16 Ohio, 86. A contrary rule was laid down in Bradlie v. Maryland Insurance Co., 12 Peters, 398, which was avowedly rested on 5 Peters, 604; but an examination of that case will show, as was shown in 12 Pick. 284, that the question did not arise, because the action was not on a valued policy; and this is also true of the case in Dudley's (S. C.) Rep. 147. In the earlier New York cases, different rules of valuation were adopted, and the question was not considered; but the rule settled in 20 Wendell, 287, has not since been departed from. The case in 12 Peters stands alone, except as supported by the decision in 3 Mason, 27, which was not referred to, and which was an attempt to exercise admiralty jurisdiction in a case of insurance. The forcible reasoning of the court in 16 Pick., *supra*, is approved in 20 Wendell, and by Judge Hare in his valuable notes to Smith v. Bell, and Wood v. Lincoln Ins. Co., 2 Amer. L. C. 345–67. The English decisions, it must be remembered, furnish no aid in this matter, because a different rule there governs the right of abandonment.

The temptation to fraud, furnished by the contrary rule, is a potent argument against it. The wear and tear, the natural depreciation of a vessel, is, of course, not an object of insurance; yet, if her value in the market is made the test, that is put upon the underwriter. It holds out, also, a direct inducement to lose the vessel. A vessel is valued, in June, 1853, at $22,500, but, after running a year, is depreciated, without accident, according to the proof, from 15 to 25 per cent., thus reducing her value to $16,000 or $18,000; if the valuation was high, as the proof shows it was in this case, the ordinary wear and tear will reduce her value, at the close of the season, to $12,000 or $15,000, independent of further

depreciation from a bad season; how convenient it would be, in such case, to dispose of the vessel to the insurer by an accident which could be converted into a total loss! The evidence in this case does not warrant such a charge against the assured, but the example proves the badness of the rule.

4. If this position is correct, the court also erred, in instructing the jury that, if the boat, in the opinion of practical men, could be raised and repaired at a cost of less than half her value, the abandonment was good. The boat was not totally destroyed in fact; and her master and crew were bound by the contract, and by the law, to do all in their power for her preservation.—1 Conn. 422; 2 Arnould, 1203; 19 Penn. 312; 20 Ohio, 228. They were bound then to test the question, and, if possible, save the boat. The terms of the policy made it incumbent on the assured to test the fact, whether the boat could not be raised and repaired for less than half her value. This was matter of proof, and not matter of speculation, or matter for the opinion of practical men.

5. The right to abandon depends on the actual facts at the time of the offer to abandon.—2 Sandf. 76; 15 Wend. 460. A valid abandonment means one warranted by the state of things existing when notice of abandonment was given.—2 Arnould, 993; 2 Phillips, § 1520. What was the true state of·facts, in case of a constructive total loss, can frequently be determined only by proof derived from subsequent events, as in such a case as this.—6 Mass. 479; 7 Pick. 254; 20 Pick. 143. The successful result of endeavors by the insurers to save the vessel, proves that the facts did not justify an abandonment at the time it was made.—4 Cranch, 202; 4 Cowen, 222; 5 ib. 63; 3 Wendell, 658. In determining the right to abandon, proof derived from subsequent events is always admissible. 12 Peters, 398. The abandonment in this case not having been accepted by the underwriters, its validity depends on the facts; and the right to make it must be tested by a consideration of all the facts existing at the time.—5 Peters, 621; 2 Wallace, Jr., 339; also, 2 Pick. 264, and cases cited *supra*.

6. The court erred, also, in refusing to instruct the jury on the duty of the master and crew to labor and travel for the safety of the boat. The facts of the case prove that, if the master had done his duty, the boat could have been raised. The crew consisted of thirty-five men, officers and hands. The boat had only twenty-eight bales of cotton on board, and was hastening down light for fear she could not get out of the river. No careful survey or examination of the boat was made at the time of the accident, nor was any consultation had, unless the off-hand expression of opinions by the crew, one to the other, can be so called. The boat was afterwards raised by six or seven men, with scanty materials obtained from the boat herself, after she had been stripped and dismantled by the master, at an expense of less than $450. Not a single one of the probabilities on which the master, himself the assured, supposed he had a right to abandon, proved to be true: he supposed the boat was broken in two, but she was not broken; he supposed the river would rise, but it continued to fall; he supposed it would rain heavily, but it did not rain at all; he supposed that the boat could not be raised, but she was easily raised; he supposed she could not be repaired, but she was readily repaired, and at a small cost; and he supposed that her reputation was totally destroyed, while it appears that she is now rated as high as before, and that insurance is as readily effected on her. These facts show, that the assured did not exercise that honest and best judgment, and did not use those exertions, which the underwriters were entitled to demand at his hands; and having failed in his duty, he cannot, by abandoning as for a total loss, visit upon the underwriters the effect of an accident which, if he could not prevent, he might have remedied.—2 Arnould, 1190; 19 Penn. 312; 20 Ohio, 228; 1 Conn. 422; 21 Pick. 482; 20 Wend. 301; 18 Pick. 83; 4 Rich. (S. C.) R. 416.

7. At the time of the accident, the boat was mortgaged to D. W. Goodman, whose debt was past due. The absolute property had thus become vested in him, and his abandonment was necessary.—2 Arnould, 1160–61; 2 Phillips, §§ 1516, 1679; Parsons on Mercantile Law,

468; 2 Pick. 249, 260; 12 Mass. 230, 235; 1 Gray, 154. An abandonment, to be valid, must be good at the time it is made. D. W. Goodman did not offer to abandon at the time of the offer by John H. Goodman, nor does it appear at what time his offer was made, except that it was "shortly afterwards." At the time of his offer, the boat may have been raised, or even brought down to Mobile; and, if made at either of those times, the abandonment was not good.—4 Cowen, 242; 3 Wendell, 662. Besides, the abandonment by D. W. Goodman, if otherwise valid, was not absolute and unconditional, as the authorities above cited show that it should have been, in order that the underwriter might, without difficulty or doubt, at once apply the salvage proceeds to remunerate him for the loss he has to pay.

8. In perfect accordance with this conditional offer was the subsequent conduct of D. W. Goodman, in taking the boat into his possession, and selling her; thus showing that he never considered himself as having given up his mortgage lien, and was not willing to rely on the validity of his abandonment for the payment of his debt. This conduct is inconsistent with the idea of a previous valid abandonment, and amounts to a waiver of whatever abandonment he had made. Nor can it be made consistent with the abandonment by any plea of necessity: he was not the owner of the boat, and had never been in possession of her; he was not charged with the preservation of the property, and could not have been affected by its loss, if he had already abandoned it to the underwriters.—10 Johns. 177. The effect of an abandonment by him was to transfer the mortgage debt to the insurers.—2 Phillips, § 1728. If John H. Goodman alone made the abandonment, it was his duty to pay off the mortgage, that the boat might be unincumbered in the hands of the insurer.—Parsons on Mercantile Law, 471.

9. The same principle, applied to the rights acquired by the Kentucky company, result in the same conclusion. The offer of abandonment was joint, to all the companies. The Franklin policy gave that company liens and rights upon the boat, which the assured have not discharged;

and the existence of these liens prevented him from making to the other offices, who are defendants in these suits, an unconditional and absolute title to and control over the boat. They are entitled, then, at least, to share in the benefit of the provisions of the Franklin policy.

10. The underwriters were not bound to state their objections to the offer of abandonment. They are entitled to await the result, and, if they say nothing, are presumed to refuse to accept.—2 Phillips, § 1691. Nor are they concluded by the fact that they repaired the vessel. That was their right, and they uniformly declared that they acted in the matter with a view to repair and return her to the assured.—16 Pick. 303; 7 Pick. 254; 22 Pick. 191; 1 Metc. 160; 20 Pick. 142.

11. The court erred, also, in making the whole sum expended in raising the boat a part of the test of injury to half value. That sum does not represent the true value of the service. The $5,000 was agreed to be paid as on a wager contract; on an emergency supposed to exist, by reason of the exaggerated statements made by the assured, as to the damages to the boat, and of the peril she was in. The fair value of the work done was the true value of the salvage service. Again, that sum includes the expense of bringing the boat to Mobile, which is no part of what the insurer was to pay; Mobile being her home port, port of destination, and port of repairs.—5 Ohio, 186; 6 Ohio, 71, 473; Wright's (Ohio) R. 202.

12. D. W. Goodman was not a competent witness for the plaintiff below. He was the assignor of one of the policies sued on, and testified to sustain a claim resting on his assignment.—Code, § 2290. He was interested, too, to sustain the validity of the abandonment; for, if that failed through his act, he would be liable in damages to J. H. Goodman. His interest as mortgagee may be balanced, but this other interest is sufficient to exclude him. In the pending chancery suit, moreover, to which he is shown to be a party, and which rests on the fact that the loss was partial only, a verdict and judgment in this suit, in favor of the plaintiff, will be evidence to defeat the bill,

and thus relieve him from a decree to account, and from the costs of the suit.

E. S. DARGAN, and R. H. SMITH, *contra.*—1. Conceding that a mortgagor may be deprived of his right to abandon, for a technical total loss, by an existing mortgage; yet, where he is the agent by whom the insurance was effected, an abandonment by him is valid.—3 Bos. & Pul. 95; 6 Cranch, 268; 21 Pick. 198. The additional fact shown in this case, that the abandonment was made with the knowledge and consent of the mortgagee, who shortly afterwards notified the insurers of his assent and approval, removes all doubt of its sufficiency.

2. The rule is settled in the United States, that an abandonment, once rightfully made, cannot be defeated by any subsequent event; though the English courts hold, that subsequent events may control an abandonment, unless suit is brought before such events occur. 12 Peters, 398, and cases there cited; 2 Phillips, § 1705, and cases cited. It is settled, also, that a parol abandonment is sufficient.—5 Peters, 604.

3. If the injury to the vessel is such, that the expense of repairs will exceed half the value of the ship when repaired, at the port of repairs, the owner may abandon as for a total loss. This is the settled rule in the United States; and the actual value of the ship when repaired, not the estimated value in the policy, is the criterion by which to determine the relative amount of the expenses. 2 Phillips, 270, 273–76; 12 Peters, 398; 5 Peters, 604; 3 Mason, 77; 2 Arnould, 1117. In estimating the amount of repairs, the sum expended in relieving the vessel from her perilous condition must be added to the repairs. 2 Arnould, 1105, 1106; 3 Mason, 77; 1 Story, 463; 3 Sumner, 220.

4. The doctrine is recognized by the whole course of American decisions, that a vessel may be so situated, or surrounded with such danger, that the assured may abandon for a technical total loss, notwithstanding she may, by some fortuitous circumstance, be relieved at an expense of less than half her value: that the true test is, whether

it was highly probable that she could not be relieved from her peril at less than half cost.—3 Mason, 77 ; 12 Peters, 398 ; 11 Johns. 293 ; 3 Kent's Com. (m. p.) 321 ; 1 Conn. 184 ; 2 M. &. S. 240, 248 ; 2 Phillips, 258.

5. Although the underwriters refused to accept in words, their conduct in taking possession and repairing the vessel, after notice of the abandonment, without informing the assured of their motive for so doing, amounted to an acceptance in fact.—3 Mason, 82–86 ; 4 B. Monroe, 451 ; 23 Pick. 355 ; 2 Arnould, 1186 ; 2 Phillips, 390. There may be cases in which the underwriters are allowed to take possession for the purpose of repairing the boat, and may offer to do so at their own expense to prevent abandonment ; though this is denied by some authorities.—3 Mason, 28 ; 1 Conn. 184 ; 2 Phillips, 296. But, conceding that they may do so, they cannot offer to repair at the joint expense of themselves and the assured, but must repair at their own expense, and within a reasonable time.—2 Phillips, 300 ; 3 Wendell, 658.

6. If the insurers refuse to accept an abandonment, the assured may sell for the benefit of all concerned ; and such a sale is no revocation of the abandonment. 5 Johns. 324 ; 4 Peters, 139 ; 6 Rich. 142 ; 2 Phillips, 393.

7. Duke W. Goodman had no disqualifying interest in the controversy. He was a mere mortgagee, not liable for repairs, because not in possession when they were done. But, whatever interest he may have, the record of this suit could not be used as evidence for or against him in another suit ; consequently, he is a competent witness under the Code.

RICE, C. J.—On the trial in the court below, it was a material question, whether the insured was justified in abandoning as for a technical total loss ; and we shall, in the first place, inquire whether, in the charges of the court in relation to that question, there is any error which entitles the underwriters to a reversal of the judgment. Those charges are reconcilable with and explanatory of each other, and must be construed in connection with each other, as well as in connection with the evidence to

which they were applied; and if, when thus construed and applied, they are correct, though as universal propositions they may be erroneous, they do not warrant a reversal of the judgment.—McBride v. Thompson, 8 Ala. R. 650; Berry v. Hardeman, 12 *ib.* 604; Lockwood v. Nelson, 16 *ib.* 294; Hopkins v. Scott, 20 *ib.* 179; Dill v. Camp, 22 *ib.* 249; Partridge v. Forsyth, 29 *ib.* 200.

Construing the charges as above indicated, we understand, and the jury doubtless understood, (see Magniac v. Thompson, 7 Peters' Rep. 348,) the expressions "practical men" and "reasonable men," as therein employed, to refer to practical men and reasonable men as a class, and not merely to the persons who were on the boat at the time she was snagged and sunk, some of whom had testified as to her condition and the circumstances attending the injury. We also understand, and the jury doubtless understood, the expression "half her value in the market," as employed in the explanation accompanying the 8th charge asked by the underwriters, to refer to her value in the market at Mobile, the place of repairs. At the time of the accident, Mobile was her port of destination, her home port, the port of repairs, and the place of the trial; and, in the second charge, the court had distinctly made the right to abandon to turn on the question, whether "the injury to the boat was such that her repairs would cost more than half her value when repaired, *at the port of repairs.*"

The underwriters contend, that the first charge excepted to put the case altogether on the opinion of practical men, and excluded from the jury the consideration of the facts. They treat that charge as if it had commenced as follows, to-wit: "If, *in the opinion of practical men,* the condition of the boat was such," &c. But the charge does not so commence, nor does it convey the meaning which it would convey if it had so commenced. On the contrary, it clearly leaves it to the jury to determine for themselves—1st, what was the condition of the boat; and, 2d, whether its condition was, in fact, such as to produce—that is, whether its condition was really sufficient to produce—in the minds of practical men gener-

ally, the opinion that the great and apparent probability was she could not be raised and repaired.   The substance of the charge was, that if *the jury found* from the evidence that the conditionof the boat was *such as to produce* that opinion in the minds of *that class of men*, it was sufficient to justify an abandonment.   That charge made the right of abandonment to depend upon the condition of the boat at the time of the abandonment, and the conclusions which practical men generally ought then to have drawn from that condition.—2 Phil. on Ins. § 1524.

We understand the other charges relating to the abandonment to assert, as applicable to this case, the following propositions, to-wit: That if the injury to the boat, occasioned by a peril insured against, was such that her repairs would cost more than half her value when repaired, at the port of repairs, then the assured had a right to abandon; that "to recover for a constructive total loss, the injury must amount to half the value of the thing insured;" that it was the duty of the master and crew, to labor and travel in order to relieve the boat from her peril, and, if they failed in this duty, the assured cannot recover; but that they were not bound to do impossibilities, and if it appeared to practical men that the boat could not be saved, they were justified in abandoning her, and were not bound to wait for the decision of the underwriters on the offer to abandon; that "the true condition of a vessel at the time of abandonment may be arrived at by evidence of the state of things derived from a subsequent attempt to raise and repair her: if the vessel has since been raised and repaired, at an expense of less than half her value in the policy, it is evidence that the assured had no right to abandon her."   It is evident, that, if there be any error in the last proposition, it is an error in favor of the underwriters, and, therefore, no ground for reversal on their appeal; and upon a careful examination of the authorities, our opinion is, there is no error in any of the other propositions.

[2.] "The right of abandonment," says Chancellor Kent, "does not depend upon the certainty, but upon the high probability of a total loss, either of the property, or

voyage, or both. The insured is to act, not upon certainties, but upon *probabilities;* and if the facts present a case of extreme hazard, and of probable expense, exceeding half the value of the ship, the insured may abandon, though it should happen that she was afterwards recovered at a less expense."—3 Kent's Com. 321. An "actual experiment is not, in general, necessary for ascertaining with reasonable certainty the probable cost and result of the undertaking" to relieve and repair the vessel, nor the only means of proving it. "Men adopt the most important resolutions, undertake or abandon the most important enterprises, upon such estimates of the probable cost and result as experience and observation can furnish," or as may be derived from the opinion of practical and reasonable men; "and facts upon which the most important interests depend are constantly determined upon such probable inferences as satisfy a reasonable mind." If the right of abandonment is to be available at all to the assured, in cases like the present, he must exercise it in reference to such an estimate of probabilities as prudent and discreet men are accustomed to act upon, and upon a fair view of every circumstance affecting the question of the practicability or probable cost of relieving and repairing the vessel; and the propriety of its exercise is to be finally judged of and decided by the like considerations, and by a due regard to any actual experiment, made by others, to relieve and repair the vessel, but is not to be conclusively established or negatived by any such experiment.—Cincinnati Insurance Co. v. Bakewell, 4 B. Monroe, 541; Bradlie v. The Maryland Insurance Co., 12 Peters, 378; Roux v. Salvador, 3 Bing. (N. C.) 288; Peele v. Merch. Ins. Co., 3 Mason, 27; 2 Arn. on Ins. 990–998; *ib.* 1052, 1059, 1092, 1111.

In this connection, it is proper to state, that the last portion of 10th charge asked by the underwriters is in conflict with the principles above sanctioned by us, and was properly refused. The last proposition asserted in that charge, exacted too much of the plaintiff. It denied him the right to recover for a total loss, if the boat "*could have been*" raised and repaired "at a cost not exceeding

half her value." It put the right rather on *a possibility*, than upon the high *probability* of a total loss.

In view of the evidence, and of the fact that the underwriters themselves agreed to pay, and did pay, to persons having no interest in the policies or in the boat, a certain amount for raising the boat and bringing her to Mobile, (her home port, port of destination, and of repairs,) we do not think they have any right to complain of the charge of the court, that "in estimating the expense of repairs, the jury should take *into consideration* the amount paid by the insurance companies for raising the boat and bringing her to Mobile, if such expenses were fairly expended" (incurred.)—2 Arn. on Ins. 1100, 1101, and cases cited in note (m) on the last cited page; 3 Kent's Com. 323, 324, 330; 2 Phil. on Ins. §. 1551.

[3.] In the policies here sued on, the boat is valued at $22,500, and the following clause occurs: "It is agreed, that the assured shall not have the right to abandon, as for a total loss, unless the injury sustained be equivalent to fifty per centum on *the value of the interest owned by the assured.*" Upon the question, what is the value of the boat with which the cost of repairs is to be compared, the charge of the court, when construed in connection with the evidence and the other charges, is understood by us to be, that it was not the value named in the policies as the agreed value of the boat, but her value in fact, when repaired, at the port of repairs. There is no error in the charge as thus understood by us, nor in the refusal of the 6th charge asked by the underwriters. As applicable to cases like the present, we sanction the principle announced in the following extract from the opinion of the supreme court of the United States, in Bradlie v. The Maryland Ins. Co., *supra*, "that if, after the damage is or might be repaired, the ship is not or would not be worth, at the place of repairs, double the cost of the repairs, it is to be treated as a technical total loss."—2 Arnould on Insurance, 1105–1112.

[4.] A "valid abandonment" is one warranted by the state of things existing when notice of abandonment is given.—2 Arn. on Ins. 993. An abandonment, made

when not warranted by the state of things existing at the time it is made—in other words, an abandonment made when no right of abandonment exists—is invalid, and, if not accepted, cannot acquire validity from any subsequent circumstances, the existence of which at the time it was made was essential to the existence of the right of abandonment. But, where an abandonment as to a mortgaged steamboat is warranted by the state of things—in other words, where the right to abandon the mortgaged boat actually exists—and where an abandonment, made or offered by the mortgagor, would be valid if assented to by the mortgagee, the underwriters are precluded from urging the want of his assent as an objection to its validity, if, at the time it was so made or offered, "they knew of the existence of the mortgages, and did not reject the abandonment on account of the mortgages; and if shortly afterwards, and when the abandonment or offer of abandonment by the mortgagor was unrevoked, and the boat, so far as the mortgagor was concerned, was still at the disposal of the defendants, (the underwriters,) the mortgagee did assent to and approve of such abandonment by the mortgagor, and did make known such his assent and approval to the defendants," (the underwriters.) If, when the abandonment was offered by the mortgagor, the underwriters had stated, as a ground of objection to its validity, that the mortgagee had not assented to or approved of it, the objection would have been open to them at the trial. In such case, it would have been competent to the mortgagor to have promptly obtained the mortgagee's assent to an abandonment, and to have again offered an abandonment accompanied by such assent. But the underwriters, with knowledge of the existence of the mortgages, did not reject the abandonment on account of their existence, and elected not to state as an objection to its validity the want of the assent of the mortgagee. By electing to pursue that course, they misled the plaintiff, and, doubtless, prevented him from promptly obtaining the assent of the mortgagee, and again offering an abandonment accompanied with such assent. The principles of good faith, recognized in the law of insurance,

require us to hold that, upon the facts hypothetically stated in the 4th charge of the court below, the underwriters have waived their right to urge the mere want of the assent of the mortgagee as an objection to the validity of the abandonment offered by the mortgagor; and that, as to them, the abandonment is valid. That charge does not proceed upon the idea, that the underwriters, by their mere silence, or otherwise, had *accepted* the abandonment; but upon the ground, that there was a *waiver* of their right to insist upon a particular objection to its validity. 2 Arn. on Ins. 1173; Skyring v. Greenwood, 4 B. & C. 281; Richards v. Browne, 3 Bing. N. C. 493, and cases there cited for the defendant.

If, upon the facts hypothetically stated in the 4th charge, and the uncontested facts of the case, the underwriters had accepted the abandonment offered by the mortgagor, as soon as the mortgagee made known to them his assent to it, the acceptance would have invested them with the ownership of the boat, with all its chances—with everything that an acceptance of the most perfect and unobjectionable offer of abandonment could have given to them. Where such an offer of abandonment is made, and the right of abandonment exists, the underwriters ought to be held to have waived every objection to the offer, which was known to them at the time, but not stated as a ground of objection, and which, if stated at the time, could have been promptly removed or remedied by the assured, and which does not deny the existence of a right of abandoment. Mere silence may not amount to an acceptance. But the silence of a party, whose duty it is to speak, may operate as a *waiver*. When his silence, however innocent in its origin, would operate ultimately as a fraud, if he were allowed the benefit which he claims from it, the law of insurance will not permit him " to resist the claims of justice under the shelter of a rule framed to promote it."

[5.] The 5th charge asserts two propositions, both of which are fully sustained by the American authorities, and are approved by us.—2 Arn. on Ins. 993, 994, and cases cited in the notes by J. C. Perkins; *ib.* 1161;

3 Kent's Com. 324; Bradlie v. Maryland Ins. Co., *supra.*

[6.] We understand the 6th charge, when construed in connection with the other charges and the evidence, to assert the proposition, that when a mortgaged boat has been abandoned by the mortgagor, and the mortgagee has assented to and approved of the abandonment, and made known such his assent and approval to the underwriters, and they have raised and repaired her, and have given notice that they will not longer be responsible for her,— "the fact" that the mortgagee, after all this, took possession of her and sold her under the mortgages, "to protect the interest of all concerned," "would not have the effect of waiving the abandonment." To that proposition we give our assent. A valid abandonment transfers "the right of property to the underwriters, to the extent of the insurance, from the moment of loss."—2 Arn. on Ins. 996. The assent to, and approval of such abandonment, on the part of the mortgagee, operates necessarily as a discharge of his mortgages, so far as the boat is concerned.—Long v. Wallis, 16 Ala. R. 738. A mortgage, discharged in this mode, cannot certainly be revived by the mere act of the mortgagee; and a sale of the boat by him, under his mortgages, after such discharge, could not deprive the mortgagor of a right to recover as for a total loss, *vested in him by a previous valid abandonment*, nor operate as a revocation or waiver of the abandonment. The mortgagee was not, in fact or in law, the owner of the boat; and his mistake of the legal effect of the existing facts could not make him her owner. Not being the owner, but having discharged his mortgages, so far as the boat was concerned, by his assent to and approval of the abandonment by the mortgagor, we cannot see how he could, by a subsequent sale, revoke or waive the abandonment, without any intention to do so, and without the assent of the mortgagor. We therefore hold, that there is no error in the 6th charge given by the court, nor in refusing the 2d, 4th and 12th charges asked by the underwriters.—3 Kent's Com. 324; 2 Arn. on Ins. 1175–1178.

If the 9th charge asked by the underwriters had been given as asked, it would have authorized the jury to find

against the right to abandon, although they might have believed from the evidence that the boat was "*wrecked*," and so injured as to require repairs to the extent of more than half her value; for the jury, although believing that, might also have believed the expense of raising and repairing her to be "a reasonable expense." The right to abandon, in case the boat was "*wrecked*," does not depend upon *the opinion of the jury* as to the mere *reasonableness* of the expense of raising and repairing her.

[7.] In the policy of the Franklin Insurance Company, (a company not sued by the plaintiff,) there is a clause in the following words: "And in case of the neglect or refusal of the assured, their agents or assigns, to adopt prompt and efficient measures for the safeguard and recovery thereof, *then the said company shall have the election* to interpose and recover said steamboat, or any part thereof, and cause the same to be. repaired," &c., &c. This is the clause which we suppose is referred to in the last part of the 13th charge asked by the underwriters here sued, and which is assumed by that charge to enure "as well to the Fulton Insurance Company, as to the Franklin Insurance Company," &c." It is evident that the clause secures to the Franklin Insurance Company *only* a mere "*election*." That "election" has not been exercised by it; and how it can enure to the underwriters here sued, whose contract does not secure to them any such election, passes our comprehension. We cannot assent to the proposition, that when A, by his contract with B, secures to himself an election; and C, by his contract with B, does not secure any such election, the election of A enures to C,—especially if the election of A has not been exercised.

The exception to the 11th charge asked by the underwriters was waived by the agreement of the counsel of the parties, set out in the record immediately after that charge. The 14th charge asked relates to a case of "partial loss," and need not here be considered, as the jury were "requested by both parties to say in their verdict whether they found the loss total or not;" and, according to such request, found the loss to be a technical *total*

loss. It is plain from the finding of the jury, that a charge as to a "*partial loss*," even if erroneous, did not injure the underwriters; and, therefore, such a charge would not authorize of reversal.

[8–9.] The underwriters "objected to the competency of Duke W. Goodman, on the ground of interest." That was the only ground of objection stated in the court below, and is, therefore, a waiver of every other ground. Creagh v. Savage, 9 Ala. R. 959. We shall not consider whether he was incompetent upon grounds of *public policy*, or by reason of section 2290 of the Code; but we shall confine our decision to the question, whether he was incompetent "on the ground of interest." According to section 2302 of the Code, interest in the event of the suit does not render the witness incompetent, "unless -the verdict and judgment would be evidence *for him* in another suit," that is, evidence for him to prove something more than the mere fact of their rendition. Upon the authority of Atwood's Adm'r v. Wright, 29 Ala. R. 346, we decide, that the verdict and judgment here cannot be evidence for Duke W. Goodman in another suit, to prove anything beyond the fact of their rendition, (as to which they would be evidence against all persons;) and that there was no error in overruling the objection to him "on the ground of interest."

We find no reversible error in the record, and affirm the judgment.